**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KYNDRYL, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>COMPUTER SCIENCES CORPORATION and DXC TECHNOLOGY COMPANY,<br><br>Defendants. | Civil Action No.___________<br><br>**COMPLAINT** |

Plaintiff Kyndryl, Inc. ("Kyndryl"), by and through its undersigned attorneys, files this Complaint against Defendants Computer Sciences Corporation ("CSC") and DXC Technology Company ("DXC" and, together with CSC, the "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for breach of contract.

2. Kyndryl is a technology company that provides vital IT services, including database and cloud storage, to some of the world's most sophisticated companies. In November 2021, Kyndryl assumed contractual obligations to provide certain technology services to an end user (the "End User"). To serve the End User, in March 2022, Kyndryl executed a subcontract (the "MSA") with another IT company, CSC, a wholly-owned subsidiary of DXC, under which CSC agreed to provide, among other things, certain data storage services at specified locations as of the contract date.

3. At all relevant times, CSC acted through DXC, including with respect to correspondence concerning the contract and the contractual dispute-resolution process.

4. From the outset, the MSA contemplated that CSC would transition data services to Kyndryl over time. A schedule to the MSA identified specific data centers, with fees to CSC expressly structured to decline, ultimately reaching zero.

5. Consistent with the MSA, the End User's need for certain specified services or service locations changed. When Kyndryl issued contractually-valid requests that Defendants cease—or "descope"—certain specified services, Defendants refused to comply. Kyndryl's descope request was accompanied by another contractually-valid request for "termination assistance" to effectuate the change in services or service locations, which Defendants likewise refused to honor.

6. Anticipating that Defendants would comply with the contractual obligations to descope, Kyndryl hired and trained employees for the changed manner of work requested by the End User, incurring costs exceeding $6 million.

7. Defendants' refusals to descope not only materially breached the MSA but also changed its fundamental nature. They have attempted to transform the MSA—intended for specific, evolving services—into an arrangement in which Defendants are entrenched and may provide those services in perpetuity, even when Kyndryl and the End User no longer require them. Under Defendants' reading, the use of data centers is fixed, and Defendants may continue charging Kyndryl for those services regardless of need. By improperly entrenching themselves in the services governed by the MSA, Defendants are at the same time positioning themselves to gain an advantage in the ongoing bidding for the End User's international data services.

8. Defendants have also failed their most basic obligations under the MSA by running software below required code levels, lengthening or causing outages that injured Kyndryl. These

outages—although caused or prolonged by Defendants—also served to advantage Defendants in the End User's ongoing competitive bids for the international data services business.

9. Following the outages, Kyndryl exercised its express and unconditional right to audit Defendants' performance under the MSA, but Defendants have refused to comply. This refusal has obstructed Kyndryl's ability to confirm Defendants' compliance with contractual obligations and raises serious questions as to why Defendants would deny such audit rights.

## PARTIES

10. Kyndryl is a Delaware corporation with its principal place of business in New York, New York.

11. Upon information and belief, CSC is incorporated in Nevada, with its principal place of business in Virginia.

12. Upon information and belief, CSC is a wholly-owned subsidiary of DXC.

13. Upon information and belief, DXC is incorporated in Nevada with its principal place of business in Ashburn, Virginia.

14. Upon information and belief, DXC was formed in April 2017 by the merger of a segment of Hewlett Packard Enterprise Company's business and CSC. DXC is a technology company that provides end-to-end information technology services.

## JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between Plaintiff and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

16. The Court has personal jurisdiction over CSC because it consented in Section 20.5.4.1 of the MSA to the exclusive jurisdiction of the courts of Massachusetts for "all actions and proceedings arising in connection with this Agreement."

17. The Court has personal jurisdiction over DXC because, as CSC's parent, and the entity through which CSC acted with respect to the MSA, it is closely related to CSC, and it was foreseeable that it would be a party to any dispute regarding the MSA. DXC is a necessary party for declaratory relief.

18. Venue is proper because Section 20.5.4.1 of the MSA provides for exclusive venue over "proceedings arising in connection with this Agreement" in the courts of Massachusetts and Section 20.5.4.2 of the MSA states that the "choice of venue is intended by the Parties to be mandatory."

## FACTUAL BACKGROUND

### The Master Services Agreement Between Kyndryl and CSC

19. In June 2015, International Business Machines Corporation ("IBM") and the End User entered into an agreement (as amended, the "Prime Contract"), under which IBM was obligated to provide certain IT infrastructure services to the End User.

20. Based upon IBM's intention to move its Infrastructure Services unit into Kyndryl as a newly public company, by an Assignment and Assumption Agreement effective November 3, 2021, Kyndryl assumed IBM's rights and obligations under the Prime Contract.

21. On March 31, 2022, CSC and Kyndryl entered into the MSA for the ultimate benefit of the End User. The MSA was effective as of April 1, 2022 (defined in the MSA as the "Effective Date"). The End User was not a party to the MSA, and the MSA expressly provided that there were no third-party beneficiaries.

22. CSC was the "Supplier" under the MSA, and both the End User and Kyndryl collectively constituted the "Customer" under the MSA.

23. While CSC was the denominated Supplier and counterparty under the MSA, at all relevant times, the actual contract performance occurred through DXC.

24. Under Section 2.1 of the MSA, CSC agreed to perform "Services," defined as those "set forth herein" and "as such Services may evolve or are otherwise supplemented, enhanced, modified, or replaced in accordance with this Agreement." The MSA further specified that the "Services shall be comprised" of "the services, functions and responsibilities described in this Agreement, its Schedules, its Exhibits, its Appendices, its Statements of Work, and any other attachment to the Agreement." The MSA also provided that CSC shall "provide personnel and expertise and perform professional, technical and project management services so as to fulfill all of the responsibilities and obligations described in this Agreement and each statement of work entered into pursuant to Schedule A." Thus, the parties could specify the required Services in a Statement of Work ("SOW") that formed part of the contract.

25. Pursuant to one such SOW concerning "Storage Services," "SOW A-2-2," CSC agreed to "coordinate activities across all of CUSTOMER's technology and business partners, including CUSTOMER's service desk, other Supplier teams, Third Party Vendors or other third parties as required by CUSTOMER." By virtue of this SOW bearing an initial designation of "A-2," it was a "Volumetric SOW" that "describe[d] certain requirements for Services that CUSTOMER *expects* will recur on a predictable or regular basis . . . ." (emphasis added.) Accordingly, Kyndryl *expected* that it would require services on a predictable or regular basis, but the SOW neither required nor guaranteed services from Defendants.

26. Schedule C of the MSA reflected the parties' agreement that, for many of the covered data centers, the expected charges declined to zero, evidencing their mutual understanding that services would be descoped or changed.

**Non-Exclusive Relationship**

27. The MSA delineated the contracting parties' "non-exclusive relationship." Under the heading "Non-Exclusive Relationship," Section 5.1 of the MSA set forth that CSC would be the "sole service provider" for "*existing services* as of the Effective Date" (emphasis added) (defined in the MSA as "Existing Services") at "In-Scope Locations as of the Effective Date" (defined in the MSA as "Initial Locations"), and that "Kyndryl shall not perform for itself, nor shall contract for, any of the Existing Services with any other service provider for the Initial Locations during the Term of this Agreement" (the "Existing Services Provision"). Thus, the Existing Services were tied to the services and locations specified as of the Effective Date, and Kyndryl was otherwise free under the Existing Services Provision to perform services itself or to contract with a service provider other than CSC.

28. Section 5.1 of the MSA also specified nine bulleted exclusions from the Existing Services Provision, and these lengthy exclusions, among other things, permitted Kyndryl to remove services based on the End User's need for technology, location or services changing since the Effective Date. The bulleted exclusions stated that the "restrictions" in Section 5.1 "shall not":

- apply to Cedar Rapids and/or any other US Data Center that does not go through its consolidation plans; or
- apply to future [End User] directed US Data Center or US Edge location migration(s) to Private Cloud; or
- prevent the implementation of a new pricing structure agreed to by both Kyndryl and DXC for international Data Center Consolidations where the technical solution has changed; or
- proscribe impose [sic] any minimum volumes to be guaranteed by Kyndryl to Supplier; or
- affect alter [sic] Customer's termination rights under Section 13; or

- prevent Customer from either performing itself or from contracting with any other service provider for services that are not Existing Services for the Initial Locations including Services added to the Initial Locations after the Effective Date; or
- prevent Customer from performing itself or from contracting with any other service provider for Existing Services at locations other than the Initial Locations; or
- prevent [the End User] from performing for itself or contracting for the Existing Services with another service provider at an Initial Location; or
- prevent [the End User] from exercising any of its rights set forth in its contract with Kyndryl, as of the Effective Date, including any of its rights to insource or obtain Services from another service provider or to designate a specific service provider to provide Existing Services.

**Termination Assistance Services**

29. Section 14 of the MSA obligated CSC to provide "Termination Assistance Services" to Kyndryl.

30. At the outset of Section 14, CSC expressly stated it "understands and agrees that CUSTOMER's business operations are dependent on the Services, and that CUSTOMER's inability to receive the Services may result in irreparable damages to CUSTOMER."

31. Section 14.1.2 of the MSA provided that the Termination Assistance Services could not be refused for any reason, including a breach by one of the parties.

32. Section 14.1.2 of the MSA further provided that "upon the expiration or termination of . . . any Statement of Work in whole or in part for any reason, including breach of this Agreement by the other Party, Supplier shall provide the Termination Assistance Services as set forth in this [Section 14: Termination and Expiration Assistance Services] and the Requirements set forth in Schedule A (Services) . . . ."

33. The MSA further provided in Section 14.2.4 that CSC "shall have no right to withhold or limit any of the Services (including the Termination Assistance Services) on the basis of any alleged breach of this Agreement by KYNDRYL, other than a failure by KYNDRYL to

timely pay the undisputed Charges for the Services (including Termination Assistance Services) rendered during the Termination Transition Period."

34. Based on these provisions, CSC, and DXC acting on CSC's behalf, had an obligation to provide Termination Assistance Services independent of whether they agreed that Kyndryl had a right to descope pursuant to Section 5.1 of the MSA.

35. Exhibit A-1-C of the MSA set forth the "Termination Assistance Services" that CSC was obligated to provide under the MSA. Section 3 of Exhibit A-1-C required CSC to provide certain information and data to Kyndryl no later than 20 business days after notice of termination. Section 7.3 of Exhibit A-1-C further required CSC to provide "Knowledge Transfer Sessions" in which CSC was required to "conduct instructional meetings as requested by CUSTOMER" and to "facilitate the transfer of Supplier Personnel's knowledge of the systems and the Services related to the Expiring Services, until CUSTOMER is satisfied with the results of such Knowledge Transfer Sessions."

36. CSC further agreed in Section 14.2.6 of the MSA that it would "timely transfer the control and responsibility for all information technology functions and Services previously performed by or for Supplier to CUSTOMER and CUSTOMER's designees by the execution of any documents reasonably necessary to affect [sic] such transfers."

**Amendments to the Prime Contract and Kyndryl's Descoping Letters**

37. Over time, the End User executed a series of amendments to the Prime Contract reflecting its changed needs. These amendments, in turn, changed Kyndryl's need for the services that CSC had been providing at certain locations pursuant to SOW A-2-2.

38. As a result of these amendments to the Prime Contract, and in accordance with the MSA's requirement that contractual notices be directed to DXC, Kyndryl duly notified Defendants

in a series of letters between August 2024 and December 2024 (the "Descoping Letters") that the End User and Kyndryl had executed amendments to the Prime Contract, that Kyndryl would be ceasing—or "descoping"—affected services, and that they would no longer be considered Existing Services under the MSA.

39. The Descoping Letters set forth the applicable exceptions to the Existing Services Provision.

40. Each of the Descoping Letters specified the Services being "descoped;" the changes in location, technology, or solution that occurred; and in a chart set forth the applicable exceptions to the Existing Services Provision with respect to CSC (the "Descoped Services").

41. To accommodate the changed services described in the amendments, Kyndryl hired and trained additional employees to handle responsibilities. Kyndryl incurred more than $6 million in costs for these additional employees, even though they have not been able to perform covered work because of Defendants' refusal to descope.

42. In material breach of the MSA, Defendants have continued to refuse to honor the Descoping Letters.

**Defendants Refuse Termination Assistance Services**

43. Each of the Descoping Letters requested Termination Assistance Services in accordance with Section 14 of the MSA, and sought to begin "working jointly with DXC on a Transition Plan to transition such services to Kyndryl."

44. Defendants have continued to refuse to provide Termination Assistance Services even though Section 14 of the MSA required CSC to provide such services, regardless of any breach.

45. Kyndryl cannot fulfill the requirements of the amendments to the Prime Contract and descope services pursuant to the MSA unless Defendants provide the Termination Assistance Services, including Knowledge Transfer Sessions.

46. Defendants' refusal to provide Termination Assistance Services constitutes a material breach of contract. It also constitutes an improper attempt to entrench themselves as a service provider in perpetuity, irrespective of changed circumstances and of whether Kyndryl and the End User need their services.

47. Defendants' refusal to provide Termination Assistance Services serves their competitive interests. As a direct competitor to Kyndryl in the End User's ongoing bids for international data services, Defendants benefit from improperly remaining embedded in the services governed by the MSA, positioning themselves to gain an advantage in those bids.

48. While Kyndryl has ceased paying for the Descoped Services, Defendants continue to invoice Kyndryl for unwanted services, totaling over $10 million despite Kyndryl's repeated demands to cease the Descoped Services.

**Defendants' Failure to Run Adequate Code Levels Breached the MSA**

49. Section 11.18.1 of the MSA provided that CSC "shall maintain Equipment and Software for which it has operational responsibility under the Agreement so that such Equipment and Software operate substantially in accordance with the Requirements."

50. Under Section 2.204 of Appendix 1 to the MSA, "Requirements" was defined to include "performance requirements included or incorporated by reference into this Agreement."

51. Section 11.18.2 of the MSA required that CSC "maintain[] Equipment in good operating condition, subject to normal wear and tear."

52. Section 11.18.3 of the MSA further required that CSC "undertak[e] repairs and preventive maintenance on Equipment in accordance with the applicable Equipment manufacturer's recommendations and requirements."

53. Section 11.18.4 of the MSA required that CSC "perform […] Software maintenance in accordance with the applicable Software Vendor's documentation, recommendations and requirements."

54. Section 2.18 of the MSA provided that CSC "shall provide personnel and expertise and perform professional, technical and project management services so as to fulfill all of the responsibilities and obligations described in this Agreement and each statement of work entered into pursuant to Schedule A."

55. Sections 2.5 and 2.5.1 of SOW A-2-1 (Server Services) stated that CSC must perform "Equipment and Software maintenance for Supplier supported Equipment and Software in accordance with manufacturer warranty" as well as Kyndryl's requirements.

56. Section 3.6.3 of SOW A-1-A (Cross Framework Services) provided that CSC shall "[r]esolv[e] incidents in a timely manner to ensure compliance with all applicable service levels."

57. Section 3.7 of SOW A-1-A required CSC to "implement[] measures to avoid unnecessary reoccurrence of incidents," perform "root cause analysis," identify "preventive measures," and recommend and "implement[] approved fixes."

58. Sections 2.6.10 and 2.6.10.2 of SOW A-2-2 (Storage Services) stated that CSC must ensure that "storage Systems are optimized per original equipment manufacturer ("OEM") recommendations and best practices."

59. Sections 3.1.1 and 3.1.1.3 of the MSA provided, respectively, that CSC "shall be responsible for any third party fees or expenses arising on or after the Commencement Date

associated with the provision of the Services described in the Agreement in accordance with the Financial Responsibility Matrix in Schedule C" and for "Software and related Third Party Contracts (including upgrades, enhancements, new versions, or new releases of such Software)."

60. Defendants ran code at levels far below OEM recommendations. This software included the Dell Unity Software and vSphere Replication software systems.

61. On or about March 4, 2025, a major production outage occurred at two mission-critical factory sites managed by the Defendants.

62. Defendants, responsible for managing the servers, chose to classify the failure as a "Severity 2" issue, scheduling replacement for the following day. Later the same day, there was a total collapse of storage services, impacting every connected server.

63. The first outage was lengthened by the fact that Defendants had allowed Dell Unity storage devices to run on outdated code version 5.1.3, and the outdated code meant the devices were incapable of restoring themselves promptly from the outage. This outage lasted just under three full days.

64. On or about March 12, 2025, another outage occurred at the same sites.

65. This second outage lasted approximately 43 hours (with partial recovery after approximately 21 hours). All critical applications at the sites were down, impacting factory operations.

66. The second outage was caused by Defendants' failure to run up-to-date code on Dell Unity devices.

67. At the relevant time of both outages, Defendants were running code at code level 5.1.3.0.5.003.

68. The code levels at the time of both outages were far below the recommended code level of 5.4.0.

69. The code level at the time of both outages was far below best practices.

70. The code level at the time of both outages was also not in accordance with Kyndryl's requirements under the MSA.

71. Defendants did not manage the incident or problems with the Dell Unity Software systems.

72. As direct competitors to Kyndryl in the End User's bids for international data services, Defendants stood to benefit from outages that they caused and prolonged by positioning themselves more favorably with the End User.

73. Defendants' breaches required Kyndryl to allocate additional resources, including personnel, and to incur equipment costs. The breaches also diverted time, attention, and resources from other business opportunities and operations, with broader effects on the business line.

74. Defendants also failed to maintain appropriate code level for the vSphere Replication software at a third site.

75. Defendants' failures constitute a material breach of the MSA.

76. Defendants' breaches have injured Kyndryl, including no less than $86,000 in additional equipment costs that were incurred as a result of Defendants' failures.

**<u>Defendants Have Refused An Audit in Breach of the MSA</u>**

77. Section 17.2.1 of the MSA required that CSC "shall […] provide to CUSTOMER […] access at reasonable hours to Supplier Personnel, to the Supplier Centralized Computing Centers at or from which Services are then being provided and to Supplier records and other

pertinent information, all to the extent relevant to the Services and Supplier's obligation under this Agreement."

78. Section 17.6.1 of the MSA provided that "[s]ubject to reasonable advance written notice and once per calendar year, [Kyndryl] may perform information security reviews on any Systems, Equipment, Software, network(s) or facilities used by [CSC] to provide the Services hereunder."

79. Both Sections 17.2.1 and 17.6.1 of the MSA set forth no conditions on Kyndryl's audit rights.

80. On May 20, 2025, Kyndryl sent Defendants a letter regarding the outages at the two server sites (the "Outage Notice") requesting access to perform an Operational Audit pursuant to Section 17.2.1 of the MSA and an Information Security Review pursuant to Section 17.6 of the MSA.

81. On June 24, 2025, DXC sent Kyndryl a letter refusing audit access pursuant to Section 17 of the MSA on the basis that Kyndryl's invocation of its contractual right to an Operational Audit and an Information Security Review "does not seem related to the events detailed in the Outage Notice."

82. Kyndryl has informed Defendants that the MSA sets forth no requirement that an audit under Section 17 of the MSA be tied to any particular breach and that, for an Information Security Review under Section 17.6.1 of the MSA, CSC is required to provide an audit on an annual basis.

83. To date, Defendants have continued to fail to provide unconditional audit access or respond to Kyndryl's requests for information. By refusing this access, Defendants, acting through DXC, have materially breached the contract.

**Kyndryl Exhausted the Contractual Dispute-Resolution Process and Terminated the MSA**

84. On or about February 27, 2025, Kyndryl entered the formal dispute-resolution process prescribed under the MSA regarding Defendants' failure to descope services. In April 2025, Kyndryl exhausted these required procedures under the MSA.

85. DXC acted on behalf of CSC during the dispute-resolution process.

86. Kyndryl also entered the formal dispute-resolution process prescribed under the MSA regarding Defendants' failure to run supported code and the outages at two sites, and the failure to provide audit access under Section 17 of the MSA. On or about August 5, 2025, Kyndryl exhausted these required procedures under the MSA.

87. On July 24, 2025, Kyndryl sent DXC a letter with the subject "Notice of Material Breach and Termination." The letter stated that the failure to descope and provide termination assistance, the failure to run code at appropriate levels, and the failure to provide audit access each constituted a material breach, whether on its own or in the aggregate. The letter gave notice pursuant to Section 13.2 of the MSA that "absent cure or resolution of these issues at the next Executive Steering Committee or 30 days after the date of this letter, whichever date is later, Kyndryl will terminate the Agreement under Section 13 in whole or in part for cause." The July 24, 2025 letter also stated that it constituted "formal notice that upon termination under Section 13, Kyndryl invokes Termination Assistance pursuant to Section 14 of the MSA."

88. On August 5, 2025, the same day the Executive Steering Committee met regarding the various breaches, DXC replied via letter refusing to accept Kyndryl's termination because it did not view the alleged breaches as "material." As such, DXC again refused to provide any Termination Assistance Services.

89. DXC's August 5, 2025, letter also stated that "DXC still desires to amicably resolve these matters." In a good faith effort to engage with DXC, Kyndryl entered into negotiations for a commercial solution, to no avail.

90. Defendants' breaches have harmed Kyndryl's commercial relationship with the End User and Kyndryl's ability to perform under the Prime Contract.

91. On December 22, 2025, Kyndryl formally terminated the MSA.

**COUNT I – DECLARATORY JUDGMENT**
**(Against Defendants CSC and DXC)**

92. Plaintiff reincorporates paragraphs 1 through 91 above as if fully set forth herein.

93. The MSA is a valid and enforceable contract and is supported by adequate consideration.

94. All notices pursuant to the MSA must be made to CSC and DXC.

95. All communications since August 2024 regarding the MSA have been between Kyndryl and DXC.

96. Kyndryl notified DXC that it was removing certain Services under the MSA, and duly requested the Termination Assistance Services prescribed under the MSA.

97. Defendants, acting through DXC, have contested that Plaintiff has a right to descope services and have refused to provide Plaintiff with Termination Assistance Services in violation of their obligations under the MSA.

98. By reason of the foregoing, an actual and justiciable controversy exists as to whether Plaintiff is entitled to remove the Descoped Services and to Termination Assistance Services under the MSA.

99. DXC acts on behalf of CSC. DXC has acted at all relevant times as a party to the contract.

100. DXC is a necessary party to this action so that the Court may accord complete relief and prevent DXC from impeding Kyndryl's ability to protect its interest.

101. To protect its rights and interest, Plaintiff requires a judicial declaration: (i) that Plaintiff has properly removed the Descoped Services; and (ii) that Defendants are obligated under the MSA to provide Termination Assistance Services to Plaintiff in connection with the Descoped Services.

**COUNT II – BREACH OF CONTRACT – SPECIFIC PERFORMANCE**
**(Against Defendants CSC and DXC)**

102. Plaintiff reincorporates paragraphs 1 through 101 above as if fully set forth herein.

103. The MSA is a valid and enforceable contract and is supported by adequate consideration to which Plaintiff and Defendant CSC are parties.

104. DXC has acted at all relevant times as a party to the contract.

105. Pursuant to the terms of the MSA, upon Plaintiff's exercise of its right to descope services, CSC shall "provide the Termination Assistance Services," including effectuating "Knowledge Transfer Sessions" in which CSC is required to "facilitate the transfer of Supplier Personnel's knowledge of the systems and the Services related to the Expiring Services, until CUSTOMER is satisfied with the results of such Knowledge Transfer Sessions."

106. Plaintiff has fully performed its material obligations under the MSA at all relevant times. Since August 2024, Plaintiff duly provided written notice via the Descoping Letters that it was removing the Descoped Services in accordance with the MSA.

107. CSC acting through DXC materially breached its obligations under the MSA to remove the Descoped Services and provide Termination Assistance Services.

108. Monetary damages cannot make Kyndryl whole. The harm caused by Defendants' breaches is ongoing, irreparable, and not reasonably compensable through money.

109. DXC is also a necessary party to this action so that the Court may accord complete relief and prevent DXC from impeding Kyndryl's ability to protect its interest.

110. Plaintiff therefore requests that the Court enter an order requiring Defendants to specifically perform under the MSA by descoping in accordance with the Descoping Letters and by providing Termination Assistance Services.

**COUNT III – BREACH OF CONTRACT**
**(Against Defendants CSC and DXC)**

111. Plaintiff reincorporates paragraphs 1 through 110 above as if fully set forth herein.

112. The MSA is a valid and enforceable contract and is supported by adequate consideration to which Plaintiff and Defendant CSC are parties.

113. DXC has acted at all relevant times as a party to the contract.

114. Plaintiff has fully performed its material obligations under the MSA at all relevant times.

115. Section 11.18.1 of the MSA required that CSC "maintain Equipment and Software for which it has operational responsibility under the Agreement so that such Equipment and Software operate substantially in accordance with the Requirements."

116. Section 11.18.2 of the MSA required that CSC "maintain[] Equipment in good operating condition, subject to normal wear and tear."

117. Section 11.18.3 of the MSA also required that CSC "undertak[e] repairs and preventive maintenance on Equipment in accordance with the applicable Equipment manufacturer's recommendations and requirements."

118. Section 11.18.4 of the MSA required that CSC "perform[] Software maintenance in accordance with the applicable Software Vendor's documentation, recommendations and requirements."

119. Section 2.18 of the MSA stated that CSC "shall provide personnel and expertise and perform professional, technical and project management services so as to fulfill all of the responsibilities and obligations described in this Agreement and each statement of work entered into pursuant to Schedule A."

120. Sections 2.5 and 2.5.1 of SOW A-2-1 (Server Services) stated that CSC must perform "Equipment and Software maintenance for Supplier supported Equipment and Software in accordance with manufacturer warranty" as well as Kyndryl's requirements.

121. Sections 3.6 and 3.7 of SOW A-1-A (Cross Framework Services) imposed duties of incident and problem management on CSC.

122. Sections 2.6.10 and 2.6.10.2 of SOW A-2-2 (Storage Services) stated that CSC must ensure that "storage Systems are optimized per [OEM] recommendations and best practices."

123. Sections 3.1.1 and 3.1.1.3 of the MSA required CSC to "be responsible for any third-party fees or expenses" tied to the Services, including "software and related Third Party Contracts (including upgrades, enhancements, new versions, or new releases)."

124. CSC, acting through DXC, breached the MSA by running software at code levels not in accordance with Kyndryl's requirements.

125. CSC, acting through DXC, breached the MSA by running software at code levels that were below the recommendations and best practices.

126. The code levels at the time of both outages were far below the recommended code level of 5.4.0.

127. The code level at the time of both outages was far below best practices.

128. The code level at the time of both outages was also not in accordance with Kyndryl's requirements under the MSA.

129. CSC, acting through DXC, did not manage the incident or problems with the Dell Unity Software systems.

130. The low code levels maintained by Defendants lengthened the outage at a server site on March 4, 2025 and caused the outage at another server site on March 12, 2025.

131. The low code levels maintained by Defendants breached the MSA.

132. Defendants' failures with respect to the code levels constituted a material breach of the MSA.

133. As a result of Defendants' breaches, Plaintiff has suffered damages in an amount to be determined at trial.

134. DXC is also a necessary party to this action so that the Court may accord complete relief and prevent DXC from impeding Kyndryl's ability to protect its interest.

135. Plaintiff therefore seeks damages in an amount to be determined.

**COUNT IV – BREACH OF CONTRACT – SPECIFIC PERFORMANCE**
**(In the Alternative Against Defendants CSC and DXC)**

136. Plaintiff reincorporates paragraphs 1 through 135 above as if fully set forth herein.

137. The MSA is a valid and enforceable contract and is supported by adequate consideration to which Plaintiff and Defendant CSC are parties.

138. DXC has acted at all relevant times as a party to the contract.

139. Plaintiff has fully performed its material obligations under the MSA at all relevant times.

140. Section 17.2.1 of the MSA required that CSC "shall […] provide to CUSTOMER […] access at reasonable hours to Supplier Personnel, to the Supplier Centralized Computing Centers at or from which Services are then being provided and to Supplier records and other

pertinent information, all to the extent relevant to the Services and Supplier's obligation under this Agreement."

141. Section 17.6.1 of the MSA provided Kyndryl the right to perform an Information Security Review "once per calendar year."

142. CSC, acting through DXC, breached the MSA by obstructing Kyndryl's right to an Operational Audit and an annual Information Security Review.

143. Monetary damages cannot make Kyndryl whole. The harm caused by Defendants' breaches is ongoing, irreparable, and not reasonably compensable through money.

144. To the extent that the Court does not grant Counts I and II, Plaintiff requests that the Court enter an order requiring Defendants to specifically perform by providing Kyndryl access for an Operational Audit and an Information Security Review.

**COUNT V – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Against Defendants CSC and DXC)**

145. Plaintiff reincorporates paragraphs 1 through 144 above as if fully set forth herein.

146. The MSA is a valid and enforceable contract and is supported by adequate consideration to which Plaintiff and Defendant CSC are parties.

147. DXC has acted at all relevant times as a party to the contract.

148. Plaintiff has fully performed its material obligations under the MSA at all relevant times.

149. The MSA contains an implied covenant of good faith and fair dealing.

150. Defendants breached the covenant of good faith and fair dealing by refusing to descope services, despite amendment from the End User, in an attempt to install themselves permanently.

151. Defendants breached the covenant of good faith and fair dealing by refusing to provide Termination Assistance Services.

152. Defendants further breached the covenant of good faith and fair dealing by running code levels far below their recommended level, resulting in damages.

153. Defendants' refusal to transition the Descoped Services, as well as their conduct following the outages, was motivated by their desire to remain embedded in the contract and to position themselves advantageously in the End User's ongoing competitive bids for international data services.

154. Defendants also breached the covenant of good faith and fair dealing by refusing audit access.

155. As a result of Defendants' breaches, Plaintiff has suffered damages to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

i. On the first claim against Defendants, granting Plaintiff's claim for declaratory relief that Plaintiff has properly removed the Descoped Services and that Defendants are obligated under the MSA to provide Termination Assistance Services to Plaintiff in connection with the Descoped Services;

ii. On the second claim against Defendants, granting Plaintiff's claim for specific performance requiring each of Defendants to descope in accordance with the Descoping Letters and provide Termination Assistance Services;

iii. On the third claim against Defendants, awarding damages in an amount to be determined at trial;

iv. On the fourth claim against Defendants, granting Plaintiff's claim for specific performance requiring Defendants to provide the information requested by Kyndryl for an Operational Audit and an Information Security Review;

v. On the fifth claim against Defendants, awarding damages to be determined at trial;

vi. Pre- and post-judgment interest as permitted by applicable law;

vii. An award of attorneys' fees and costs; and

viii. Such other relief as the Court deems just and equitable.

DATED: December 22, 2025

Respectfully submitted,

By */s/ Andrew Skroback*

Andrew Skroback (BBO #567863)
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, New York 10019-6022
Tel: (212) 318-3000
andrew.skroback@nortonrosefulbright.com

Sandeep Savla (NYB #3992013)
(to be admitted *pro hac vice*)
Anthony Lauriello (NYB #5568969)
(to be admitted *pro hac vice*)
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, New York 10019-6022
Tel: (212) 318-3000
sandeep.savla@nortonrosefulbright.com
anthony.lauriello@nortonrosefulbright.com

*Attorneys for Plaintiff Kyndryl, Inc.*