**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **KYNDRYL, INC.,**<br><br>**Plaintiff and Counter-Defendant,**<br><br>**v.**<br><br>**COMPUTER SCIENCES CORPORATION and DXC TECHNOLOGY COMPANY,**<br><br>**Defendants and Counter-Plaintiffs.** | ) | **Civil Action No. 25-13943-FDS** |

**MEMORANDUM AND ORDER ON**
**<u>MOTIONS TO DISMISS</u>**

**SAYLOR, J.**

This is a contract dispute between technology service providers. Jurisdiction is based on diversity of citizenship. Plaintiff Kyndryl, Inc. subcontracted with defendant Computer Sciences Corporation ("CSC"), a wholly-owned subsidiary of defendant DXC Technology Company, to provide data storage services to an end user. A Master Services Agreement ("MSA") executed by the parties granted CSC exclusive rights over certain services. The MSA also obligated CSC to provide "termination assistance" if services were terminated under certain circumstances.

During the term of the contract, Kyndryl attempted to "descope" certain services. The complaint alleges that under the MSA, descoping is a valid termination mechanism. It alleges that defendants have materially breached the MSA by refusing to descope and provide termination assistance in connection with those services. Kyndryl also contends that defendants

have materially breached the MSA by running code below recommended levels and refusing to allow it audit access.

Defendants allege that CSC still retains exclusive rights to the descoped services. They also contend that Kyndryl has materially breached the MSA by refusing to pay for additional services, take over disk-backup services, and pay for "stranded assets."

DXC has moved under Fed. R. Civ. P. 12(b)(2) to dismiss the claims against it for lack of personal jurisdiction. Both defendants have also moved under Fed. R. Civ. P. 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief can be granted.

Kyndryl has cross-moved under Rule 12(b)(6) to dismiss the counterclaims for failure to state a claim upon which relief can be granted.

For the following reasons, the motion of DXC to dismiss for lack of personal jurisdiction will be denied, and the cross-motions to dismiss will be granted in part and denied in part.

## I. Factual Background

### A. Plaintiff's Allegations

The following facts and allegations are as set forth in the complaint.

Kyndryl, Inc. is a company that provides various technology and data storage services. (Compl., Dkt. No. 1 ¶ 2). On November 3, 2021, Kyndryl contracted to provide certain technology services to an end user ("the End User"). (*Id.* ¶ 20).

On March 31, 2022, Kyndryl executed a Master Service Agreement ("MSA") with Computer Sciences Corporation ("CSC") to fulfill its obligations to the End User. (*Id.* ¶ 21; Savla Ex. A, Dkt. No. 36-1 at 2). CSC is a wholly-owned subsidiary of DXC. (Compl., Dkt. No. 1 ¶ 2). CSC agreed to provide certain data storage services at specified locations. (*Id.*).

Both the End User and Kyndryl are collectively designated as the "Customer" under the MSA. (Savla Ex. A, Dkt. No. 36-1 at 2). CSC is the designated "Supplier" and counterparty

under the MSA. (*Id.*). Nonetheless, at all relevant times, actual contract performance has occurred through DXC. (Compl., Dkt. No. 1 ¶ 23). The End User is not a party to the MSA. (*Id.* ¶ 21).

Kyndryl and CSC, as parties to the MSA, agreed that all proceedings arising in connection with the MSA would be litigated in either state or federal court in Massachusetts. (Savla Ex. A, Dkt. No. 36-1 at 110).

**1. <u>Descoped Services</u>**

Section 2 of the MSA outlines terms concerning the services CSC is obligated to provide. (*Id.* at 3). Section 2.1 of the MSA states that CSC "shall provide services set forth herein . . . as such Services may evolve or are otherwise supplemented, enhanced, modified, or replaced in accordance with this Agreement." (*Id.* at 4). The MSA specifies that these "Services shall be comprised" of "the services, functions and responsibilities described in this Agreement, its Schedules, its Exhibits, its Appendices, its Statement of Work, and any other attachment to this Agreement." (*Id.* at 4-5). Kyndryl and CSC can specify required services in a Statement of Work ("SOW") that forms part of the MSA. (Compl., Dkt. No. 1 ¶ 24).

SOWs include designations concerning whether Kyndryl expects the services to recur on a predictable basis. (*Id.* ¶ 24). For example, "Volumetric" SOWs describe "certain requirements for Services that [the Customer] expects will recur on a predictable or regular basis." (Savla Ex. B, Dkt. No. 36-2 at 3). "Projects" describe services that Kyndryl "does not expect will recur on a predictable or regular basis." (*Id.*).

Section 5.1 of the MSA governs Kyndryl and CSC's "Non-Exclusive Relationship." (Savla Ex. A, Dkt. No. 36-1 at 23). That provision states that CSC "shall be the sole service provider for the existing services as of the Effective Date (the 'Existing Services') for the benefit of the End User performed at the In-Scope Locations as of the Effective Date (the 'Initial

Locations')." (*Id.*). Section 5.1 provides that "Kyndryl shall not perform for itself, nor shall contract for, any of the Existing Services with any other service provider for the Initial Locations during the Term of this Agreement." (*Id.*). It also enumerates nine conditions upon which exclusivity does not apply. (*Id.*). It states that the restrictions of Section 5.1 shall not:

- apply to Cedar Rapids and/or any other US Data Center that does not go through its consolidation plans; or
- apply to future [End User] directed US Data Center or US Edge location migration(s) to Private Cloud; or
- prevent the implementation of a new pricing structure agreed to by both Kyndryl and DXC for international Data Center Consolidations where the technical solution has changed; or
- proscribe impose [sic] any minimum volumes to be guaranteed by Kyndryl to Supplier; or
- affect alter [sic] Customer's termination rights under Section 13; or
- prevent Customer from either performing itself or from contracting with any other service provider for services that are not Existing Services for the Initial Locations including Services added to the Initial Locations after the Effective Date; or
- prevent Customer from performing itself or from contracting with any other service provider for Existing Services at locations other than the Initial Locations; or
- prevent [End User] from performing for itself or contracting for the Existing Services with another service provider at an Initial Location; or
- prevent [End User] from exercising any of its rights set forth in its contract with Kyndryl, as of the Effective Date, including any of its rights to insource or obtain Services from another service provider or to designate a specific service provider to provide Existing Services.

(*Id.*).

Section 13 of the MSA sets out seven conditions under which Kyndryl or CSC may terminate the MSA. (*Id.* at 66). As relevant here, Section 13.2 permits Kyndryl to terminate the

MSA "for cause." (*Id.* at 67). That provision states that Kyndryl may "terminate this Agreement or any Statement of Work, in whole or in part" if CSC "materially breaches the Agreement" and fails to cure the breach within thirty days after written notice. (*Id.*). Section 13.6.1 allows Kyndryl to terminate for convenience under certain circumstances. (*Id.* at 68). That provision states that Kyndryl, on 90 days' written notice and subject to termination charges, may in its "sole discretion" "elect to terminate this Agreement, in whole or in part at its convenience" if the End User has terminated its agreement with Kyndryl for any reason. (*Id.*). Section 13.7.1 requires CSC to provide termination assistance with respect to services that are "terminat[ed] pursuant to [Section 13]." (*Id.* at 69).

Section 14 of the MSA provides the requirements for "Termination Assistance Services." (*Id.*). Under Section 14.1.1, CSC acknowledges that the Customer's "business operations are dependent on the Services, and that [its] inability to receive the Services may result in irreparable damages to [it]." (*Id.*). Therefore, Section 14.1.2 states that "upon the expiration or termination of this Agreement or any Statement of Work in whole or in part for any reason, including the breach of this Agreement by the other Party, [CSC] shall provide . . . Termination Assistance Services." (*Id.*). Moreover, Section 14.2.4 states that CSC "shall have no right to withhold or limit . . . Termination Assistance Services[] on the basis of any alleged breach of this Agreement." (*Id.* at 71).

Over time, the End User amended its contract with Kyndryl to reflect its changing needs. (Compl., Dkt. No. 1 ¶ 37). Those amendments modified Kyndryl's need for the services that CSC had been providing at certain locations pursuant to SOW A-2-2. (*Id.*).

In a series of four letters dated between August 2024 and December 2024, Kyndryl informed CSC and DXC that due to its amended contract with the End User, it would be

"descoping" affected services such that they would no longer be considered "Existing Services" under the MSA. (Savla Ex. F, Dkt. No. 36-9; Savla Ex. G, Dkt. No. 36-10; Savla Ex. H, Dkt. No. 36-11; Savla Ex. I, Dkt. No. 36-12). Each letter specified the services being descoped, the changes in location, technology, or solution, and the applicable exceptions from Section 5.1's exclusivity provision. (*Id.*). Kyndryl invoked termination assistance for the descoped services in accordance with Section 14 of the MSA. (*Id.*).

According to the complaint, CSC and DXC have refused to either descope services or provide termination assistance. (Compl., Dkt. No. 1 ¶ 41, ¶ 44). To accommodate its amended contract with the End User, Kyndryl has allegedly incurred more than $6 million in costs to hire and train additional employees. (*Id.* ¶ 41). However, those employees have not been able to perform because of CSC's refusal to descope. (*Id.*). Defendants have continued invoicing Kyndryl for the descoped services, totaling more than $10 million. (*Id.* ¶ 48). Kyndryl has not paid for the descoped services. (*Id.*).

### 2. <u>Adequate Code Levels</u>

Section 11.18 of the MSA governs Maintenance Warranty requirements. (Savla Ex. A, Dkt. No. 36-1 at 65). Section 11.18.1 states that CSC "shall maintain Equipment and Software for which it has operational responsibility under the Agreement so that such Equipment and Software operate substantially in accordance with the Requirements." (*Id.*). Section 11.18.2 requires that CSC "maintain[] Equipment in good operating condition." (*Id.*). Section 11.18.3 mandates that CSC "undertak[e] repairs and preventative maintenance on Equipment in accordance with applicable . . . recommendations." (*Id.*). Section 11.18.4 requires that CSC "perform[] Software maintenance in accordance with the applicable Software Vendor's documentation, recommendations and requirements." (*Id.*).

According to the complaint, on March 4, 2025, a major production outage occurred at two mission-critical factory sites. (Compl., Dkt. No. 1 ¶ 61). DXC and CSC classified the failure as a "Severity 2" issue, scheduling replacement for the following day. (*Id.* ¶ 62). Later that same day, there was a total collapse of storage services, impacting every connected server. (*Id.*). The outage lasted just under three days. (*Id.* ¶ 63). The complaint alleges that at the time of both outages, the code was outdated, meaning that the devices were incapable of restoring themselves promptly from the outage. (*Id.*).

On March 12, 2025, another outage occurred at the same sites. (*Id.* ¶ 64). The second outage lasted approximately 43 hours, with partial recovery after 21 hours. (*Id.* ¶ 65). All critical applications at the sites were down, impacting factory operations. (*Id.*). The second outage was allegedly caused by failure to run up-to-date code. (*Id.* ¶ 66).

CSC and DXC also allegedly failed to maintain appropriate code levels for software at a third site. (*Id.* ¶ 74). According to the complaint, maintaining code below recommended levels required Kyndryl to allocate additional resources and incur equipment costs, and also diverted time, attention, and resources away from other business operations. (*Id.* ¶ 73). The complaint alleges that as direct competitors to Kyndryl in the End User's bids for international data services, defendants stood to benefit from the outages they caused. (*Id.* ¶ 72).

### 3. <u>Audits</u>

Section 17 of the MSA governs audits. (Savla Ex. A, Dkt. No. 36-1 at 96). Section 17.2, which governs Operational Audits, states that CSC shall provide Kyndryl "access at reasonable hours to [CSC] Personnel, to the [CSC] Centralized Computing Centers at or from which Services are then being provided and to [CSC] records and other pertinent information, all to the extent relevant to the Services and [CSC's] obligation under this Agreement." (*Id.*). Section 17.6 governs Information Security Reviews, and provides that "[s]ubject to reasonable advance

written notice and once per calendar year, [the Customer] may perform information security reviews on any Systems, Equipment, Software, network(s) or facilities used by [CSC] to provide the Services hereunder." (*Id.* at 101). Section 17.7 provides that all audits will be "performed in a manner so as not to interfere materially and unnecessarily with [CSC]'s ability to perform the Services in accordance with the Service Levels." (*Id.* at 102).

On May 20, 2025, Kyndryl sent a letter concerning the outages at the server sites, requesting access to perform an Operational Audit and an Information Security Review. (Compl., Dkt. No. 1 ¶ 80). On June 24, 2025, DXC sent Kyndryl a letter stating that "[w]ile DXC will comply with its contractual obligations as to Kyndryl's audit demand, it appears Kyndryl has requested access and data that is unrelated to the Outages Notice." (Ex. G, Dkt. No. 24-7). Kyndryl responded that the MSA sets forth no requirement that either an Operational Audit or Information Security Review be tied to a specific breach. (Compl., Dkt. No. 1 ¶ 82). According to the complaint, defendants have failed to provide unconditional audit access or respond to Kyndryl's requests for information. (*Id.* ¶ 83).

**4. <u>Termination of the MSA</u>**

On February 27, 2025, Kyndryl initiated the formal dispute-resolution process set forth in the MSA concerning CSC's failure to descope services, failure to run supported code, and failure to provide audit access. (*Id.* ¶ 84, ¶ 86). In April 2024, Kyndryl exhausted those required procedures. (*Id.*). DXC acted on behalf of CSC during the dispute-resolution process. (*Id.* ¶ 85).

On July 24, 2025, Kyndryl sent DXC and CSC a "Notice of Material Breach and Termination." (*Id.* ¶ 87; Savla Ex. J, Dkt. No. 36-13). The letter stated that the failure to descope and provide termination assistance, the failure to run code at appropriate levels, and the

failure to provide audit access each constituted a material breach. (*Id.*). The letter also stated that per Section 13.2 of the MSA, "absent cure or resolution of these issues . . . [Kyndryl] will terminate the Agreement under Section 13 in whole or in part for cause." (*Id.*). The letter also stated that "upon termination under Section 13, Kyndryl invokes Termination Assistance pursuant to Section 14 of the MSA." (*Id.*).

On August 5, 2025, DXC sent Kyndryl a letter refusing to accept Kyndryl's termination because it did not view the alleged breaches as "material." (Compl., ¶ 88; Savla Ex. K, Dkt. No. 36-14). Accordingly, DXC refused to provide termination assistance. (*Id.*). DXC stated that it "still desire[d] to amicably resolve these matters." (*Id.*). Kyndryl entered into negotiations, but no agreement was reached. (Compl., ¶ 89). On December 22, 2025, Kyndryl formally terminated the MSA. (*Id.* ¶ 91).

### B. <u>The Counterclaim Allegations</u>

The following facts and allegations as are set forth in the counterclaim.

On March 31, 2022, CSC and Kyndryl entered into the MSA. (Counterclaim, Dkt. No. 27 ¶ 16). The MSA went into effect on April 1, 2022, and its term was extended to run through December 31, 2027. (*Id.*).

#### 1. <u>Descoping</u>

Certain "Existing Services" and "Initial Locations" are documented in attachments to the MSA, including Schedule C, and in SOWs. (*Id.* ¶ 21). Under Section 4.1.1 of the MSA, "Locations" encompass customer locations, CSC locations, and other approved locations. (*Id.* ¶ 22; Savla Ex. A, Dkt. No. 36-1 at 17). Pursuant to SOW A-2-1-A-2-5, CSC is to provide Server Services, Storage Services, Database Services, and Data Center Services. (Counterclaim, Dkt. No. 27 ¶ 25-28). The SOWs did not mandate a particular technology, database type, software type, or hardware type. (*Id.*). Under the Pricing Matrix of the MSA, SOWs are

distinguished from Resource Units. (*Id.* ¶ 50). Resource Units are specific pieces of technology used to provide the broadly defined Services in the SOWs. (*Id.* ¶ 51).

On July 19, 2024, Kyndryl wrote to CSC that it had "recently signed a new agreement with [the End User] implementing a new pricing structure leveraging transformed technical solution for storage services." (*Id.* ¶ 42). As a result, Kyndryl wanted to "initiate the transfer of services from DXC to Kyndryl for all storage solutions in the US." (*Id.*). In that communication, Kyndryl did not state that the Storage Services would be moved to a new location. (*Id.* ¶ 44). It did not invoke any termination provision of Section 13 of the MSA. (*Id.* ¶ 46). It also did not offer any reason as to why exclusivity provisions of Section 5.1 would no longer apply to the Services. (*Id.*). CSC declined to initiate the transfer. (*Id.* ¶ 47).

On August 14 and 21, 2024, Kyndryl sent three letters to DXC entitled "Descope of Certain Storage Services." (Savla Ex. F, Dkt. No. 36-9; Savla Ex. G, Dkt. No. 36-10; Savla Ex. H, Dkt. No. 36-11). The letters stated that the End User had directed Kyndryl to remove certain Existing Services from the Statement of Work A-2-2 as well as the related Resource Units. (*Id.*). The letters also stated that "the Descoped Services are no longer Existing Services under the Agreement and not subject to the exclusivity clause set forth in Section 5 of the Agreement." (*Id.*). The letters indicated which Section 5.1 exception applied to each Service. (*Id.*). For some of the listed services, the letters included a new location where the services were to be provided. (*Id.*). The letters also requested DXC provide Kyndryl with termination assistance for the descoped services. (*Id.*).

On August 29, 2024, after CSC rejected its attempt to descope services, Kyndryl sent a letter to CSC alleging breach of the MSA. (Counterclaim, Dkt. No. 27 ¶ 61). The letter stated that "the descoping of the Reduced Services is a termination in part of Statement of Work A-2-

2." (*Id.*). The letter also stated that Kyndryl required termination assistance so that it could begin performing the transformed services itself. (*Id.* ¶ 62).

On September 13, 2024, Kyndryl sent another letter stating that it intended to descope portions of Statement of Work A-2-1. (*Id.* ¶ 66). On September 30, 2024, Kyndryl sent a further letter entitled "Descope of Certain Services in Poland." (*Id.* ¶ 67). In an additional letter sent on April 11, 2025, Kyndryl indicated that its intention was to take over the services in question. (*Id.* ¶ 67). On December 5, 2024, Kyndryl sent an additional "Descope Letter" purporting to descope portions of SOW A-2-2 in Georgia. (*Id.* ¶ 71).

Kyndryl stopped paying for descoped services. (Id. ¶ 72). CSC has continued to provide the services so as not to harm the End User. (*Id.* ¶ 73). Kyndryl's unpaid invoices exceed $15 million and may increase. (Id. ¶ 75). Kyndryl also has outstanding invoices for non-descoped work. (Id. ¶ 87).

**2. <u>Disk Backup Services</u>**

Section 6 of Amendment 5 of the MSA provides "for all countries outside of the United States, Kyndryl will take over all Disk Backup Services on or before March 1, 2024." (*Id.* ¶ 77). According to the counterclaim, Kyndryl did not assume the international disk backup services by March 1, 2024, and has not assumed the services since. (*Id.* ¶ 79). CSC has continued to provide international disk backup services as a result to prevent harm to the End User. (*Id.* ¶ 80). CSC has outstanding invoices totaling more than $1 million for those services that Kyndryl has not paid. (*Id.*).

**3. <u>Stranded Assets</u>**

The Pricing Matrix includes certain "Pricing Assumptions." (*Id.* ¶ 83). The Pricing Assumptions state that "Kyndryl will pay to CSC the net book value of all stranded assets" that

become stranded by any action of Kyndryl or the End User. (*Id.*). According to the counterclaim, assets have become stranded in the course of performance of the MSA. (*Id.* ¶ 84). CSC has invoiced for those payments, but Kyndryl has not made the payments. (*Id.* ¶ 85). To date, the value of the stranded assets exceeds $2.7 million. (*Id.* ¶ 86).

#### 4. Termination of the MSA

On December 22, 2025, Kyndryl terminated the MSA "for cause" on the ground that CSC materially breached the contract by refusing to descope, running code below recommended levels, and refusing to submit to audits. (*Id.* ¶ 93). CSC alleges that those are pretextual grounds to avoid paying for the services that CSC continues to provide to the End User. (Id. ¶ 88).

## II. Procedural Background

Plaintiff filed the complaint on December 22, 2025. DXC has moved to dismiss the complaint for lack of personal jurisdiction. Defendants have also moved to dismiss the complaint for failure to state a claim upon which relief can be granted. Defendants filed seven counterclaims on February 9, 2026. Plaintiff has moved to dismiss the counterclaims for failure to state a claim upon which relief can be granted.

## III. DXC's Motion to Dismiss for Lack of Personal Jurisdiction

DXC has moved to dismiss all claims against it for lack of personal jurisdiction. The exercise of personal jurisdiction over a defendant must be authorized by statute and accord with the due-process requirements of the U.S. Constitution. *See A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58 (1st Cir. 2016). Consistent with those requirements, a court may exercise either general or specific jurisdiction. *See Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 35 (1st Cir. 2016).

The plaintiff bears the burden of establishing that the court has personal jurisdiction over a defendant. *See Rosenthal v. Bloomingdales.com, LLC*, 101 F.4th 90, 94 (1st Cir. 2024). In

considering a motion to dismiss under Rule 12(b)(2), the court may employ several standards to assess whether plaintiff has carried that burden: the "prima facie" standard; the "preponderance-of-the-evidence" standard; or the "likelihood" standard. *See id.* at 51 n.5; *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145-46 (1st Cir. 1995). Where, as here, the court considers a motion to dismiss under Fed. R. Civ. P. 12(b)(2) without first holding an evidentiary hearing, the *prima facie* standard applies. *See United States v. Swiss Am. Bank*, *Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001).

Under that standard, the court takes the plaintiff's "properly documented evidentiary proffers as true and construe[s] them in the light most favorable to [the plaintiff's] jurisdictional claim." *A Corp.*, 812 F.3d at 58. The plaintiff may not "rely on unsupported allegations in its pleadings." *Id.* (quoting *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 134 (1st Cir. 2006)) (alteration omitted). Instead, the plaintiff "must put forward 'evidence of specific facts' to demonstrate that jurisdiction exists." *Id.* (quoting *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145 (1st Cir. 1995)). Facts offered by the defendant "become part of the mix only to the extent that they are uncontradicted." *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 8 (1st Cir. 2009) (quoting *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007)).

Kyndryl does not contend that DXC is subject to personal jurisdiction under the Massachusetts long-arm statute. Instead, it contends that DXC consented to jurisdiction, even though it is not a signatory under the MSA, pursuant to the MSA's forum-selection clause.[1] In substance, Kyndryl contends that there is no meaningful distinction for jurisdictional purposes between DXC and CSC.

[1] Forum-selection clauses enjoy a presumption of enforceability. *Huffington v. T.C. Grp.*, 637 F.3d 18, 23 (1st Cir. 2011) (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15, 17 (1972)).

It points first to the MSA, which refers to both DXC and CSC, sometimes interchangeably. For example, although Section 0.0.1 names CSC as the "Supplier," Section 2.279 of Appendix 1 states that "'Supplier' means DXC Technology Services LLC."[2] Section 5.1 states that the exclusivity provision does not prevent new pricing agreements between Kyndryl and DXC. And Amendment 5 states that "DXC reserves its right to initiate formal dispute resolution procedures."

The complaint also alleges that all services under the MSA were executed by DXC, that all invoices were generated on DXC letterhead, and that the MSA dictated that all communications with CSC should be copied to DXC's in-house counsel. Finally, when Kyndryl sent CSC and DXC a notice of material breach, DXC's in-house counsel responded by saying that "DXC denies that it breached the Agreement," that "DXC will comply with its contractual obligations," and that "DXC" would provide termination assistance if obligated.

Under the circumstances, those allegations give rise to a plausible inference that it was reasonably foreseeable to DXC that it would be bound by the terms of the MSA—the only relevant "contractual obligation"—and that accordingly it would be bound by the forum-selection clause, thereby consenting to the exercise of personal jurisdiction in a Massachusetts court. It is well-established that forum-selection clauses can be enforced against a non-signatory when that party is "closely related to the dispute such that it becomes foreseeable that it will be bound." *Boom-OS LLC v. Dom N'Tom, Inc.*, 2023 WL 6378188, at *4 (D. Mass. Sept 29, 2023) (citation omitted). "There is a close relation when the non-signatory's interests are derivative of or related to the signatory's interests or conduct." *Id.* (citation omitted); *see also Doe v.*

[2] It is unclear whether that is a different entity from DXC Technology Company, the named defendant in this proceeding.

*Seacamp Ass'n, Inc.*, 276 F. Supp. 2d 222, 228 (D. Mass. 2003) ("where the source of the duty which the defendants allegedly owed to the plaintiffs is derived from the contractual relationship, the contractual provisions should govern.") (citation modified); *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 24 (1st Cir. 2009) (finding that a patient's wife's claim for emotional distress was bound by the pre-procedure consent documents containing a forum-selection clause signed by the patient). Here, there is a plausible basis to suggest that DXC believed that it was bound by the MSA, and therefore bound by its forum-selection clause, and thus consented to the jurisdiction of this court.

At the very least, the issue of personal jurisdiction cannot be resolved on the current record. Whether jurisdictional discovery on that issue is warranted must await further developments in the proceeding.[3] Accordingly, the motion of DXC to dismiss for lack of personal jurisdiction will be denied without prejudice.

## IV. Defendants' Motion to Dismiss under 12(b)(6)

CSC[4] has moved to dismiss the complaint for failure to state a claim. To survive a motion to dismiss under Rule 12(b)(6), the complaint must state a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When determining whether a

[3] Whether there is some other basis for personal jurisdiction, such as the alter-ego doctrine, need not be resolved at this time.

[4] In this section, "CSC" refers collectively to both defendants, CSC and DXC.

complaint satisfies that standard, a court must "take the complaint's well-pleaded facts as true, and . . . draw all reasonable inferences in the plaintiff's favor." *Lowe v. Mills*, 68 F.4th 706, 713 (1st Cir. 2023) (quoting *Frese v. Formella*, 53 F.4th 1, 5 (1st Cir. 2022)) (citation modified). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

**A. <u>Count 1</u>**

Kyndryl seeks declaration that under the MSA, it properly removed descoped services and that CSC is therefore obligated to provide termination assistance in connection with those services. "Contract interpretation questions, under Massachusetts law, are ordinarily questions of law for a court." *Nadherny v. Roseland Prop. Co.*, Inc., 390 F.3d 44, 48 (1st Cir. 2004). In interpreting a contract, a court seeks to give "effect to the parties' intentions and construe the language to give it reasonable meaning wherever possible." *Shea v. Bay State Gas Co.*, 383 Mass. 218, 224-25 (1981). In addition, a court "construe[s] a contract as a whole, so as to give reasonable effect to each of its provisions." *James B. Nutter & Co. v. Estate of Murphy*, 478 Mass. 664, 669 (2018) (citation modified). A court must interpret it in accordance with its ordinary and plain meaning. *See Balles v. Babcock Power Inc.*, 476 Mass. 565, 571 (2017).

Kyndryl interprets the MSA as follows. Section 2.1.1 and Schedule A allow Kyndryl and the End User to modify the "scope, schedule, Milestones, Deliverables, or other aspects" of any SOW with no right of refusal. End User and Kyndryl executed amendments to their own contract that directed Kyndryl to remove certain services from the SOW. Under Section 5.1 Exception No. 9, that amended contract took precedence over Section 5.1's exclusivity provision, which states that CSC shall be the sole service provider for existing services. Therefore, in

Kyndryl's view, it properly removed services, or "descoped," as directed by the End User, and is thus entitled to termination assistance.

Kyndryl's interpretation contravenes the plain meaning of the MSA. Section 5.1, by its own terms, is an exclusivity provision that outlines the conditions under which CSC shall be the sole provider of existing services. The provision states that its terms for exclusivity do not "affect [or] alter Customer's termination rights under Section 13." Section 13, in turn, lists seven discrete termination triggers, none of which include descoping. Section 13.7.1 conditions termination assistance on a Section 13 termination event, stating that CSC is obligated to provide termination assistance "after the effective date of any termination pursuant to [Section 13]."

Kyndryl contends that Section 13's list of termination events is non-exhaustive because Section 13.9.1 allows cumulative remedies. But that section simply allows plaintiff to seek all available remedies, such as both legal and equitable relief. It does not, however, permit plaintiff to rewrite the MSA by appending additional termination events to Section 13. *See, e.g.*, *275 Washington St. Corp. v. Hudson River Int'l, LLC*, 465 Mass. 16, 27 (2013) ("[The cumulative remedies clause] merely declares that a party's election of one remedy does not foreclose the party's ability to seek another remedy that is available 'at law or in equity.'"). Therefore, as descoping is not listed in Section 13, the logical inference is that it is not intended to be a termination event. *See, e.g.*, *United States v. Okoye*, 731 F.3d 46, 49 (1st Cir. 2013) (citation modified) ("*Expressio unius est exclusio alterius* . . . instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded.") (citation modified).

Kyndryl also contends that it is independently entitled to termination assistance under Section 14.1.2. That section states that CSC will provide termination assistance "upon the

expiration or termination of this Agreement or any Statement of Work in Whole or in part for any reason." Kyndryl contends that the use of the phrase "expiration or termination . . . for any reason" means that non-Section 13 events can trigger termination assistance; otherwise, the term "expiration" would be rendered superfluous. The Court does not find that reasoning persuasive. Contractual interpretation allows for the possibility that parties will sometimes use a "belt and suspenders" approach to emphasize a particular contractual provision. *See, e.g.*, *United States v. Bronstein*, 849 F.3d 1101, 1110 (D.C. Cir. 2017). The canon against surplusage only "counsels courts presented with two reasonable interpretations—one that contains surplusage and one that does not—to choose the one without." *Brazil v. Auto-Owners Ins. Co.*, 3 F.4th 1040, 1044 (8th Cir. 2021). Here, Kyndryl's interpretation is unreasonable because it would have the Court either misinterpret Section 13.9.1's conditional remedies clause to read in an additional termination event or negate Section 13.7.1.'s conditional language that obligates defendant to provide termination assistance upon a Section 13 event.

It is noteworthy that the MSA includes a mechanism by which Kyndryl could accommodate its amended contract with the End User. Section 13.6.1 allows Kyndryl, in its "sole discretion," to "terminate this Agreement, in whole *or in part*," if the End User has terminated with Kyndryl, subject to 90 days' written notice and termination charges. Kyndryl contends that it could not have invoked Section 13.6.1 because that provision governs the termination of an Agreement, while the End User had directed changes at the service level. That analysis is unpersuasive. SOWs outline the services and technologies that CSC will provide to Kyndryl and the End User. Removing services constitutes terminating "a part" of the overall Agreement between the parties.

Accordingly, defendants' motion to dismiss Count 1 will be granted.[5]

**B. Count 2**

Kyndryl seeks an order requiring specific performance under the MSA by descoping in accordance with its letters and by providing termination assistance. Because the Court concludes that under the MSA, descoping is not a termination event that obligates CSC to provide termination assistance, defendants' motion to dismiss Count 2 will be granted.

**C. Count 3**

Kyndryl contends that CSC materially breached the MSA by running software at code levels that were below its requirements and best practices and asks the Court to award damages. Section 11.18 of the MSA requires CSC to maintain equipment in good condition and perform software maintenance in accordance with the software vendor's recommendations. And Section 2 obligates CSC to perform maintenance in accordance with manufacturer warranty.

Kyndryl alleges that on March 4, 2025, a major production outage occurred at two mission-critical factory sites managed by CSC. It contends that these outages were caused by CSC's failure to run up-to-date code on its devices, in violation of best practices.

Based on those allegations, Count 3 adequately pleads that CSC ran software at code levels that materially breached the terms of the MSA. Accordingly, defendants' motion to dismiss Count 3 will be denied.

**D. Count 4**

Kyndryl contends that CSC materially breached the MSA by obstructing its right to an Operational Audit and Information Security Review and seeks an order requiring specific

---

[5] Kyndryl also contends that it is entitled to termination assistance under Section 13.2 of the MSA because it terminated the MSA "for cause." Under Count 1, Kyndryl seeks only a declaration that termination assistance is required "in connection with descoped services." If Kyndryl seeks termination assistance for all services under Section 13.2, it may seek leave of this Court to amend its pleadings accordingly.

performance. Section 17.2.1 permits an Operational Audit, stating that CSC "shall . . . provide to [Kyndryl] . . . access at reasonable hours to [CSC] Personnel, to the [CSC] Centralized Computing Centers at or from which Services are then being provided and to [CSC] records and other pertinent information." Section 17.6.1 allows an Information Security Review, stating that "[s]ubject to reasonable advance written notice and once per calendar year, [Kyndryl] may perform information security reviews."

On May 20, 2025, Kyndryl, in response to the two data outages, sent CSC a letter requesting access to perform both an Operational Audit and an Information Security Review. On June 24, 2025, CSC, in a letter incorporated in the complaint, said that it would "comply with its contractual obligations as to [Kyndryl's] audit demand," although it "appear[ed] that [Kyndryl] requested access and data unrelated to the Outages Notice." One month later, Kyndryl sent CSC a Notice of Material Breach, stating that although it had since met with CSC to discuss the audit, CSC had yet to provide it with contractually required access. Kyndryl alleges that CSC conditioned audit access on contractual limitations not outlined in Section 17. It is not clear from the pleadings whether CSC flatly refused the request, objected to the scope of the request, or applied conditions to the request. Regardless, the MSA permits both an Operational Audit and an Information Security Review subject to reasonable advance notice, and the complaint has alleged that CSC has refused to allow it to do so. At this stage, that is sufficient to state a claim.

Kyndryl requests that the Court order specific performance. Specific performance should not be awarded unless a party establishes that "damages are an inadequate remedy and the nature of the contract is such that specific enforcement of it will not involve too great practical difficulties." *Sanford v. Bos. Edison Co.*, 316 Mass. 631, 634 (1944). When balancing the burdens and advantages of specific performance, courts must ensure that "the terms of the

contract are sufficiently definite to provide the basis for an appropriate order." *Atlantech Inc. v. Am. Panel Corp.*, 540 F. Supp. 2d 274, 285 (D. Mass. 2008) (citation modified). Courts must consider "difficulty in enforcement or supervision, and general principles of fairness and public policy." *Id.*

Kyndryl contends that CSC's refusal to provide audit access deprives it of information essential to its obligations to the End User, which cannot be adequately remedied through damages. Massachusetts courts have enforced audit rights such as inspecting financial, payroll, or other records that do not involve significant judicial supervision. *See, e.g.*, *Atlantech Inc.*, 540 F. Supp. at 286-87 (ordering inspection of warehouse records because it required only that defendant "turn over a small set of documents"); *see also JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 587 (6th Cir. 2007) (affirming audit of financial records). But courts will not enforce provisions that involve personal services. *Adams v. Messenger*, 147 Mass. 185, 189 (1888).

Section 17.2.3 of the MSA states that CSC shall "provide any assistance reasonably requested by [the Customer] . . . in conducting any such audit." Section 17.7.2 states that "[a]ll audits will be performed in a manner so as not to interfere materially and unnecessarily with [CSC's] ability to perform." The degree of assistance and coordination required for the audits Kyndryl seeks is a factual question not appropriate for resolution on this motion.

Accordingly, defendants' motion to dismiss Count 4 will be denied.

**E. <u>Count 5</u>**

Finally, Kyndryl contends the CSC breached the implied covenant of good faith and fair dealing by running code levels far below their recommended level and refusing to provide audit access. A covenant of good faith and fair dealing is implied in every contract. *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). The

covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 471-472 (1991) (quotations omitted). "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Restaurants*, 441 Mass. at 385.

A party may breach the covenant of good faith and fair dealing implicit in every contract without breaching any express term of that contract. *Marx v. Globe Newspaper Co., Inc.*, 13 Mass. L. Rep. 190, *10-11 (Mass. Super. 2001); *see Fortune v. National Cash Register Co.*, 373 Mass. 96, 101, 105 (1977). Otherwise, the implied covenant would be a mere redundancy. The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance. *Marx*, 13 Mass. L. Rep. at *10-11; *Larson v. Larson*, 37 Mass. App. Ct. 106, 110 (1994).

CSC contends that this claim should be dismissed because it merely duplicates the factual allegations of breach of contract claims. The Court disagrees. A party may breach the covenant of good faith and fair dealing if it took "unilateral, voluntary action that advanced its own self-interest and prevented or hindered plaintiff[] from reaping substantial benefits of the contract." *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 135 (D. Mass. 2005). Here, Kyndryl contends that even if CSC adhered to the terms of the MSA, CSC exercised its contractual rights in bad faith in order to entrench itself as incumbent service provider and gain competitive advantage. Those pleadings are enough to state a claim.

Accordingly, defendants' motion to dismiss Count 5 will be denied.

## V. Counter-Defendant's Motion to Dismiss

### A. Counterclaim Count 1

CSC[6] contends that Kyndryl materially breached the MSA by failing to pay for descoped work. As noted, the Court has concluded that Kyndryl was not permitted under the MSA to utilize descoping as a termination mechanism.

CSC also contends that Kyndryl materially breached the MSA by failing to pay for additional services, failing to assume the international disk backup services, and failing to pay for stranded assets. Section 6 of Amendment 5 to the MSA states that Kyndryl agrees to "take over all Disk Backup Services on or before March 1, 2024." The MSA's pricing matrix states that Kyndryl will pay the value of all stranded assets if caused by any actions of Kyndryl or the End User. CSC alleges that Kyndryl has not taken over the disk backup services. CSC also alleges that Kyndryl has not paid for assets that have become stranded over the course of the MSA. Those allegations are sufficient to state a claim.

Accordingly, Kyndryl's motion to dismiss Counterclaim 1 will be denied.

### B. Counterclaim Counts 2-3

Pleaded as alternatives to Counterclaim Count 1, CSC seeks recovery for its services under the equitable theories of quantum meruit and unjust enrichment. Under Fed. R. Civ. P. Rule 8(d), "[a] party may state as may separate claims or defenses as it has, regardless of consistency." "[D]espite the mutual exclusivity of damages for breach of contract and unjust enrichment, it is accepted practice to pursue both theories at the pleading stage." *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 84 (1st Cir. 2020) (citation modified). Courts, however, may dismiss equitable claims when the contract provides an "adequate remedy at law." *Id.* at 82-83.

[6] In this section, "CSC" refers collectively to both counter-plaintiffs, CSC and DXC.

Kyndryl contends that the MSA completely governs CSC's claim. However, the contract does not explicitly contemplate descoping. It may well be that CSC can recover under the pricing and payment terms of the MSA. At this stage, at least, the Court need not reject the equitable counterclaims on the ground that CSC is limited to a contractual remedy.

Kyndryl also contends that CSC's equitable claims should be dismissed because its descoping letters show that it expressly rejected CSC's services. In so doing, Kyndryl relies on *E. Renovating Corp. v. Roman Cath. Bishop of Springfield*, where the First Circuit rejected a construction worker's claim that he was entitled to recover the fair value for work he had previously agreed, through a settlement, he would not do. 554 F.2d 4, 6 (1st Cir. 1977). The Court disagrees with that characterization of *E. Renovating Corp*. Unlike the construction worker there, CSC did not previously agree that it would refrain from providing services to the End User. Instead, the MSA required it to provide services to the End User, and Kyndryl attempted, by descoping, to terminate those services. Kyndryl's attempt to descope does not foreclose CSC from being able to seek an equitable remedy.

Accordingly, Kyndryl's motion to dismiss Counterclaims 2 and 3 will be denied.

**C. <u>Counterclaim Count 4</u>**

CSC seeks declaratory judgment that the MSA has not terminated. The Declaratory Judgment Act and Fed. R. Civ. P. 57 allow courts to grant or deny declaratory relief, even where another remedy exists. Under Fed. R. Civ. P. 12(f), courts may dismiss claims that are "redundant" such that they "consist of allegations that constitute a needless repetition of other averments." *Zurich Am. Ins. Co. v. Watts Regul. Co.*, 796 F. Supp. 2d 240, 245-46 (D. Mass. 2011) (citation modified). The First Circuit has held that pleading a declaratory judgment claim that duplicates a breach of contract claim is subject to dismissal as redundant. *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 237 (1st Cir. 2013) (citations omitted) (dismissing claim for

declaratory relief where it "merely duplicate[ed] Count I, which also assert[ed] a cause of action for breach of [contract]"); *see also Guilfoile v. Shields Pharmacy, LLC*, 2021 WL 4459515, at *5 (D. Mass. Sept. 29, 2021) (dismissing claim requesting declaratory judgment as duplicative of breach of contract claim). Massachusetts courts have also struck repetitious pleadings, such as "counterclaim[s] that merely . . . seek[] the opposite effect of the complaint." *Zurich*, 796 F. Supp. 2d at 246 (collecting cases).

Kyndryl contends in its complaint that it terminated the MSA because CSC materially breached the contract by (1) refusing to honor Kyndryl's descoping, (2) running code below recommended levels, and (3) refusing audit access. The Court has held that descoping is not a valid termination mechanism under Count 1. Whether Kyndryl validly terminated the MSA for cause on the other two grounds will be resolved in Counts 3 and 4.

Because this claim addresses issues already before the Court, Kyndryl's motion to dismiss Counterclaim Count 4 will be granted.

**D. <u>Counterclaim Count 5</u>**

CSC seeks declaratory judgment that descoping cannot terminate the MSA in whole or in part. Again, this claim is a mirror image of Count 1, which the Court has already resolved, by concluding that descoping is not a valid termination mechanism under the MSA.

Accordingly, Kyndryl's motion to dismiss Counterclaim Count 5 will be granted.

**E. <u>Counterclaim Count 6</u>**

CSC seeks a declaratory judgment that it has the exclusive right to perform the services Kyndryl purported to descope. In contrast to Counterclaims Counts 4 and 5, this count pleads a distinct claim for relief. The Court resolved under Count 1 whether descoping was a valid termination mechanism under the MSA, but it has not resolved whether descoping triggers one

of the exclusivity exceptions of Section 5.1 such that CSC is no longer the exclusive service provider of those services.

CSC alleges that it retains exclusive rights under Section 5.1 because descoping changed underlying technology, or "Resource Units," which did not convert an "Existing Service" into a non-Existing Service. Whether each of the specific services Kyndryl attempted to descope were classified as services or technologies, were at "Initial Locations," and fulfill one of Section 5.1's exceptions has not been sufficiently briefed as to be appropriately resolved at this stage.

Accordingly, Kyndryl's motion to dismiss Counterclaim Count 6 will be denied.

### F. Counterclaim Count 7

Finally, CSC contends that Kyndryl breached the implied covenant of good faith and fair dealing by (1) claiming it had the right to perform services that CSC had exclusive right to perform under the MSA, (2) refusing to pay for descoped work while knowing that CSC would not cease to do such work in a manner that would harm the End User, and (3) terminating the MSA pretextually to put pressure on CSC to relinquish its claims to rightful payment and to gain negotiating advantages in further work for the End User.

Kyndryl contends that CSC simply repeats its breach of contract claims. The Court disagrees. CSC alleges that Kyndryl initially tried to transfer services to defeat CSC's exclusivity rights. When that did not work, CSC alleges that Kyndryl manipulated the MSA's exclusivity provisions by changing services in a non-substantive way to terminate portions of the MSA. CSC contends that Kyndryl pretextually terminated the MSA on these frivolous grounds because Kyndryl viewed CSC as a competitor rather than cooperator. It is a reasonable inference from those claims that Kyndryl may have engaged in bad faith behavior that deprived CSC of the benefit of its bargain. *See, e.g.*, *Bos. Med. Ctr. Corp. v. Sec'y of Exec. Off. of Health & Hum.*

*Servs.*, 463 Mass. 447, 459-60 (2012) (noting that parties may breach the implied covenant of good faith and fair dealing by engaging in "bad faith or unfair dealing").

Accordingly, Kyndryl's motion to dismiss Counterclaim Count 7 will be denied.

## VI. Conclusion

For the foregoing reasons,

1. the motion of defendant DXC Technology Company to dismiss for lack of personal jurisdiction is DENIED without prejudice;
2. the motion of defendants to dismiss for failure to state a claim upon which relief can be granted is GRANTED as to Counts 1 and 2 of the complaint and otherwise DENIED; and
3. the motion of plaintiff to dismiss for failure to state a claim upon which relief can be granted is GRANTED as to Counts 4 and 5 of the counterclaim and otherwise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
United States District Judge

Dated: September 1, 2026